# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| IN RE | : CHAPTER 13 |
| | : |
| JAMES C. ESCHER | : |
| DEBTOR(S) | : BANKRUPTCY NO. 05-31711 SR |
| | : |
| JAMES C. ESCHER AND VIOLA ESCHER | : |
| PLAINTIFFS | : |
| | : |
| V. | : |
| DECISION ONE MORTGAGE COMPANY, LLC | : |
| MORTGAGE ELECTRONIC REGISTRATION | : |
| SYSTEMS, INC., COUNTRYWIDE HOME | : |
| LOANS, INC., AND MORTGAGE | : |
| MANAGEMENT SPECIALISTS | : |
| DEFENDANTS | : ADVERSARY NO. 05-607 |
| | : |

# OPINION

BY: STEPHEN RASLAVICH, UNITED STATES BANKRUPTCY JUDGE.

## INTRODUCTION.

The Plaintiffs (the Debtor and his wife) have filed suit against Decision One Mortgage

Company (Decision), Mortgage Electronic Registration Systems, Inc. (MERS), Countrywide

Home Loans, Inc. (Countrywide) and Mortgage Management Specialists (MMS).  Their

Complaint raises claims under federal and state consumer lending law.  Decision and

Countrywide/MERS[1] have filed Motions for Summary Judgment as to all of the claims.  The

Plaintiffs oppose both motions.  For the reasons which follow, the Motions will be granted.[2]

*The Causes of Action*

---

[1] They are represented by the same counsel.

[2] Because the Complaint seeks to avoid a secured interest in the Debtor's property (i.e., rescission of the
mortgage loan, it is a core proceeding pursuant to 28 U.S.C. §157(b)(2)(K).  That subparagraph includes
among core proceedings "determinations of the validity, extent, or priority of liens."

The Complaint pleads four counts: Count I - Truth in Lending[3] ("TILA"); Count II - the Real Estate Settlement Procedures Act (RESPA);[4] Count III - the Pennsylvania Credit Services Act (CSA)[5] and the Pennsylvania Loan Brokers Trade Practices Regulations (LBTPR);[6] and Count IV - the Pennsylvania Uniform Trades Practices and Consumer Protection Law.[7]  Count I is directed at Decision, Countrywide and MERS.  Count II has since been abandoned.  Plaintiffs' Brief, 2.  Count III has been limited to MMS.  *Id.*  Count IV is directed against all Defendants.

*Standard for Summary Judgment*

Motions for summary judgment are governed by Rule 56 of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.").  Pursuant to Rule 56, summary judgment should be granted when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). For purposes of Rule 56, a fact is material if it might affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The moving party has the burden of demonstrating that no genuine issue of fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552-53, 91 L.Ed.2d 265 (1986).

The court's role in deciding a motion for summary judgment is not to weigh evidence, but

---

[3] 15 U.S.C. § 1601 et seq.

[4] 12 U.S.C. § 2601 et seq.

[5] 73 P.S. § 2181 et seq.

[6] 37 Pa. Code § 305.1 et seq.

[7] 73 P.S. § 201-1 et seq.

rather to determine whether the evidence presented points to a disagreement that must be decided at trial, or whether the undisputed facts are so one sided that one party must prevail as a matter of law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247-252, 106 S.Ct. at 2509-12.  In making this determination, the court must consider all of the evidence presented, drawing all reasonable inferences therefrom in the light most favorable to the nonmoving party, and against the movant. *See United States v. Premises Known as 717 South Woodward Street*, 2 F.3d 529, 533 (3rd Cir.1993); *J.F. Feeser, Inc. v. Serv-A-Portion, Inc.*, 909 F.2d 1524, 1531 (3d Cir.1990), *cert. denied*, 499 U.S. 921, 111 S.Ct. 1313, 113 L.Ed.2d 246 (1991); *Gould, Inc. v. A & M Battery and Tire Service*, 950 F.Supp. 653, 656 (M.D.Pa.1997).

To successfully oppose entry of summary judgment, the nonmoving party may not simply rest on its pleadings, but must designate specific factual averments through the use of affidavits or other permissible evidentiary material that demonstrate a triable factual dispute. *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 247-50, 106 S.Ct. at 2509-11. Such evidence must be sufficient to support a jury's factual determination in favor of the nonmoving party. *Id.* Evidence that merely raises some metaphysical doubt regarding the validity of a material fact is insufficient to satisfy the nonmoving party's burden. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355-56, 89 L.Ed.2d 538 (1986). If the nonmoving party fails to adduce sufficient evidence in connection with an essential element of the case for which it bears the burden of proof at trial, the moving party is entitled to entry of summary judgment in its favor as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. at 322-23, 106 S.Ct. at 2552-53.

*The Respective Roles*
*of Decision One, MERS*
*and Countrywide*

3

The Court begins with what it sees as the threshold issue: what exactly are the interests of Decision, MERS and Countrywide in this transaction?  This matters as Countrywide/MERS has enunciated inconsistent interests in the loan.  In its Amended Answer, Countrywide/MERS admitted that the loan had been assigned to it but denied that it was the present holder.  Amended Answer, ¶ 4.  Yet at the hearing, Countrywide did *not* deny that it was the holder of the loan. *See* Transcript (T-) 21.  This caused the Court to schedule a supplemental hearing to clarify the point.  At that hearing, counsel for Countrywide and Decision appeared but Plaintiffs' counsel did not.  Notwithstanding, the two Defendants informed the Court that they had reached a stipulation as to the parties' respective interests in the loan.  According to the Stipulation, Decision was the original lender; the loan was transferred to Countrywide who, in turn, transferred it to Bank of New York; Bank of New York remains the holder; Countrywide is the servicer; and MERS is the nominee who assisted in the assignment and recording of the mortgage.[8]  *See* Stipulation dated May 9, 2007.  Although Plaintiffs' counsel was not present, he later agreed to the terms of the stipulation.  *See* Letter of Plaintiffs' Counsel dated May 11, 2007.  The Court turns now to the merits of the motions.

*The TILA Claim*

Count I alleges violations of TILA.  Specifically, it is alleged that the lender failed to

---

[8] MERS' role as nominee leads the Court to conclude that it cannot be liable on any of the Plaintiffs' claims.  A nominee is understood to be an agent for another. *See In re Adler Coleman Clearing Corp.*, 277 B.R. 520, 569 n.177 (Bankr.S.D.N.Y.2002) ("Nominee" in its most common usage means one who holds property of record for another, and who acts at the direction of another, with the other having *the entire beneficial interest.*") The record bears this out: MERS first appears as the entity who brought the foreclosure complaint on behalf of Countrywide. *See* Exhibit 31 to Escher Dep., Ex. B to Countrywide Brief.  Therefore, MERS will be dismissed from this action and no further reference to MERS will be made.

disclose certain fees as "finance charges." Complaint ¶ 7. These violations, the Plaintiffs

conclude, entitle them to three forms of relief: first they are entitled to monetary damages for the

lender's *failure to disclose*; second, they may *rescind the loan* because of that non-disclosure;

and third, they are entitled to an additional money judgment for Countrywide's *refusal to honor*

*their rescission request. Id.* ¶¶ 11-15. Decision responds that the claim is neither supported by

the record nor was it timely brought. Decision's Brief, 4-6. Countrywide argues that as a good

faith assignee, it is not liable for any failure to disclose on the part of its predecessor.

Countrywide's Brief, 7-12.

*Statute of Limitations*

The Court begins with Decision's assertion that Count I is stale. A claim for a failure to

make the disclosures required under TILA is subject to the one year statute of limitations:

> (a) Individual or class action for damages; amount of award;
> factors determining amount of award
>
> Except as otherwise provided in this section, any creditor who fails
> to comply with any requirement imposed under this part[9],
> including any requirement under section 1635 of this title, … is
> liable to such person in an amount equal to the sum of–
> (1) any actual damage sustained by such person as a result of the
> failure;
> (2)A)(I) in the case of an individual action twice the amount of any
> finance charge in connection with the transaction,…(iii) in the case
> of an individual action relating to a credit transaction not under an
> open end credit plan that is secured by real property or a dwelling,
> not less than $200 or greater than $2,000;
> …
> (e) *Any action under this section may be brought* in any United
> States district court, or in any other court of competent jurisdiction,
> *within one year* from the date of the occurrence of the violation …

---

[9] "Part" here refers to Part B - Credit Transactions," 15 U.S.C. §§ 1631 through 1649. Section 1638
requires the disclosure, among other things, of the "finance charge." 15 U.S.C. § 1638.

15 U.S.C. § 1640(a),(e) (emphasis added). *See Oldroyd v. Associates Consumer Discount Co.*,

863 F.Supp. 237, 240 (E.D.Pa.1994) ("Actions under the Truth in Lending Act must be brought

within one year of the violation, though a consumer may raise violations of the Act as a defense

to a collection action after the expiration of the filing period."). Because the disclosures are

required to be made before the credit is extended (*see* 15 U.S.C. § 1638(b)(1); 12 C.F.R. §

226.17(b)), the violation occurs when the loan is made. *Ralls v. Bank of New York (In re Ralls)*,

230 B.R. 508, 515 (Bankr.E.D.Pa.1999). The applicable regulation provides that "[t]he creditor

shall make disclosures before consummation of the transaction." *See* 12 C.F.R. 226.17(b); *see*

*also Chevalier v. Baird S & L*, 371 F.Supp. 1282, 1284 (E.D.Pa.1974) ("The date of the violation

is deemed to be the date the transaction was consummated"); *Smith v. Equicredit Corp.*, 2002

WL 32349873 *3 (E.D.Pa.) (same); *McMaster v. CIT Group/Consumer Finance, Inc.*, 2006 WL

1314379 *4 (E.D.Pa.) ("A violation occurs when a consumer become contractually obligated on

a credit transaction" citing 12 C.F.R. § 226.2(13))

    In this case, Decision points out, the loan closed (that is, the transaction consummated)

on November 5, 2003. Complaint, ¶ 5. The Complaint, however, was not filed until September

29, 2005, a date well more than one year from the date of the violation. *See* Adversary Docket,

05-607 #1. For purposes of *affirmative* monetary recovery[10] resulting from a failure to disclose,

then, Count I must be dismissed.


*Deadline to Rescind*

    Plaintiffs' response to all this is that they made a timely request for rescission because

_____

[10] The Complaint indicates an intention to raise this claim via recoupment. *See* Complaint ¶ 2.

certain disclosures weren't made.  Complaint, ¶ 14; T-20.  Because that request was wrongly

denied, they explain, they are entitled to damages resulting from that refusal.  Complaint ¶ 15.

This is separate and apart from rescission of the loan itself.  The limitations period on that

damage claim, they conclude, commences from the date that the lender refuses the rescission

request.  Plaintiffs' Brief, 3

The Truth in Lending Act grants a consumer the right to rescind a transaction until

midnight of the third business day following consummation of the transaction, delivery of the

required notice of the right to rescind, or delivery of all "material disclosures," whichever occurs

last.  15 U.S.C. § 1635(a); 12 C.F.R. § 226.23(a)(3).  If the required notice or "material

disclosures" are not delivered, the right to rescind is extended until three years after

consummation of the transaction.  15 U.S.C. § 1635(f); 12 C.F.R. § 226.23; *Smith v. Fidelity*

*Consumer Discount Co.*, 898 F.2d 896, 902 (3d Cir. 1990).

Plaintiffs, then, are correct when they maintain that their claim for rescission and for

damages resulting from rescission are timely.  Their demand for rescission was made on August

29, 2005.  *See* Complaint, Ex. D.  That is within three (3) years of the date of the violation, i.e.,

the date that the loan was consummated (November 5, 2003).  Therefore, the Court finds the

rescission claim to have been timely brought.

*Time-Bar Applicable to Damage*
*Claims Resulting From Refusal*
*of Rescission Request*

Plaintiffs seek not only rescission, but damages caused by the lender's refusal to allow

them to rescind.  Where a valid rescission request is wrongfully refused, the borrower is entitled

to damages proximately caused by that refusal:

In any action in which it is determined that a creditor has violated

> this section, in addition to rescission the court may award relief
> under section 1640 of this title for violations of this subchapter not
> relating to the right to rescind.

15 U.S.C. § 1635(g).  The limitations period on such a damage claim begins to run after the

lender wrongfully refuses the request.  *See Smith, supra,* 898 F.2d at 903*; see also Oldroyd,*

*supra,* 863 F.Supp. at 240 ("the limitations period runs from the date of rescission only if the

violated alleged is the failure of the lender to terminate its security interest upon rescission.");

*McNinch v. Mortgage America, Inc. (In re McNinch)*, 250 B.R. 848, 852 (Bankr.W.D.Pa.2000)

(holding that statute of limitations on TILA claim arising out of assignee's failure to respond to

borrower's rescission request did not begin to run until 20 days after assignee's receipt of

rescission notice); *McIntosh v. Irwin Union Bank & Trust Co.*, 215 F.R.D. 26, 30 (D.Mass.2003)

(holding that the limitations period for damages resulting from rescision is three years); *Malfa v.*

*Household Bank, F.S.B.*, 825 F.Supp 1018, 1020 (S.D.Fla.1993) (holding that although

consumers' claims for damages for lender's original Truth in Lending Disclosure Act disclosure

violations were barred by one-year statute of limitations, lender's refusal to honor a rescission

notice gave rise to a separate claim for damages and, since consumers brought action for

damages within one year of lender's refusal to honor rescission notice, that claim for damages

was not barred by limitations); *Tucker v. Beneficial Mortgage Company*, 437 F.Supp.2d 584, 590

(E.D.Va.2006) (holding that mortgage company's failure to respond within 20 days to

homeowners' notice of rescission of loan agreement triggered one-year statute of limitations

under Truth in Lending Act (TILA) for homeowners' claim against mortgage company for

statutory damages arising from its failure to accept the rescission.)

The Plaintiffs' rescission request was dated August 29, 2005; it was refused September

22, 2005.  *See* Complaint, Ex. D and E.  The Complaint seeking, inter alia, damages for such

8

refusal was filed on November 5, 2003.  *See* Docket.  Against that backdrop, the Court finds the

damage claim relating to the refusal to honor the rescission request to have been timely filed.

*Summary of Findings as
to Limitations Challenges
as to TILA Claim*

It is only the claim for damages for the lender's alleged failure to disclose which is time-

barred.  Accordingly, Count I is dismissed but only as to Decision.  As to Countrywide, the

motion is denied for two reasons: first, it is Plaintiffs' intention to raise the TILA claim for

recoupment purposes against an anticipated proof of claim.  Complaint, ¶ 2.  Second, the

Plaintiffs are also alleging a right to rescind on account of those alleged non-disclosures as well

as resulting damages.  Because the right to rescind is based on the failure of the lender to make

disclosure, the Court must determine the merits of that claim regardless of timeliness.  If such

claim is supported by the record, then the Court must determine if the rescission/damage claim

has merit.  Assuming it does, the Court must next determine if the record demonstrates that

Countrywide knew (or should have known) of that violation when it purchased the loan.

*TILA's Disclosure Requirement*

The Congressional purpose of TILA was to inform the consumer of the true cost of

credit:

> The Congress finds that economic stabilization would be enhanced
> and the competition among the various financial institutions and
> other firms engaged in the extension of consumer credit would be
> strengthened by the informed use of credit. The informed use of
> credit results from an awareness of the cost thereof by consumers.
> It is the purpose of this subchapter to assure a meaningful
> disclosure of credit terms so that the consumer will be able to
> compare more readily the various credit terms available to him and
> avoid the uninformed use of credit, and to protect the consumer
> against inaccurate and unfair credit billing and credit card practices.

15 U.S.C. § 1601(a). *Thomka v. A.Z. Chevrolet, Inc.*, 619 F.2d 246, 248 (3d Cir.1980) ("The

Truth in Lending Act was passed primarily to aid the unsophisticated consumer so that he would

not be easily misled as to the total costs of financing.")  To accomplish its purpose, the TILA and

its implementing Regulation Z require lenders to disclose to consumers certain material terms

clearly and conspicuously in writing.  *See* 15 U.S.C. § 1632(a), 1638(b)(1); 12 C.F.R. §

226.17(a)(1); *see also Nichols v. Mid-Penn Consumer Discount Co.*, 1989 WL 46682 *4

(E.D.Pa.) ("[T]he TILA and Reg. Z ... guarantee ... meaningful disclosure of credit terms by

requiring the creditor to give the borrower a Disclosure Statement specifying the credit terms in

clear and straightforward language.") Among the material terms that must be disclosed include

the "finance charge."  15 U.S.C. § 1638(a)(3).

*Disclosure of Brokers' Fees
as a Finance Charge*

Plaintiffs allege that the lender-paid broker's commission should have been separately

disclosed as a finance charge.  *See* Complaint ¶ 7.  Both the applicable statute and regulation

define "finance charge" to include certain broker's fees:

> (6) Borrower-paid mortgage broker fees, including fees paid
> directly to the broker or the lender (for delivery to the broker)
> whether such fees are paid in cash or financed.

15 U.S.C. § 1605(a)(6), and

> (a)(3) Special rule; *mortgage broker fees*. Fees charged by a
> mortgage broker (including fees paid by the consumer directly to
> the broker or to the creditor for delivery to the broker) *are finance
> charges* even if the creditor does not require the consumer to use a
> mortgage broker and even if the creditor does not retain any
> portion of the charge.

12 C.F.R. § 226.4(a)(9).  In this case, however, the broker fee is alleged to be a "yield spread

premium."  *See* Complaint, ¶ 7.  A recent District Court opinion defines a "yield spread

premium" as:

> a bonus paid to a broker when it originates a loan at an interest rate
> higher than the minimum interest rate approved by the lender for a
> particular loan. The lender then rewards the broker by paying it a
> percentage of the yield spread" (i.e., the difference between the
> interest rate specified by the lender and the actual interest rate set
> by the broker at the time of origination) multiplied by the amount
> of the loan.

*Oscar v. Bank One, N.A.* 2006 WL 401853 *5 (E.D.Pa.) *citing In re Bell,* 309 B.R. 139, 153 n. 9

(Bankr.E.D.Pa.2004) (citing *Noel v. Fleet Finance, Inc.*, 971 F.Supp. 1102, 1106-07

(E.D.Mich.1997)).  In this District, a yield spread premium is not required to be separately

disclosed as a finance charge because it is already part of the interest component.  Interest on a

loan is required to be separately disclosed.  *See Strang v. Wells Fargo Bank, N.A.* 2005 WL

1655886 *5 (E.D.Pa.); *Oscar, supra*; *Stump v. WMC Mortgage Corp.*, 2005 WL 645238 *4

(E.D.Pa.); *see also* 61 F.R. 26126, 26127 (reporting Federal Reserve Board's conclusion that

yield spread premium should not be disclosed as a pre-paid finance charge pursuant to 15 U.S.C.

§ 1605(a)(6) because it is already included in the interest rate: "Fees paid by the funding party to

a broker as a 'yield spread premium,' that are already included in the finance charge, either as

interest or as points, should not be double counted."); *see also* Official Staff Interpretation to

Regulation Z, 12 C.F.R. § 226, Supp. I, ¶ 4(a)(3)3 ("Compensation paid by a creditor to a

mortgage broker under an agreement is not included as a separate component of a consumer's

total finance charge (although this compensation may be reflected in the finance charge if it

comes from amounts paid by the consumer to the creditor that are finance charges, such as points

and interest)")

      Although the Complaint uses the precise term "yield spread premium" (*see*  Complaint ¶

7),  Plaintiffs' now back off from that characterization.  They maintain that it is not clear from

the record that the additional broker compensation is a yield spread premium *"in the sense that it had a direct effect in increasing the lowest interest rate to which the Plaintiffs would have otherwise have [sic] been entitled …"* Plaintiffs' Brief, 8 (emphasis added).  Alternatively, they argue, even assuming that the fee is a yield spread premium, it is not clear from the record *where* it is disclosed among the loan documents.  *Id.*, 8.  Finally, Plaintiffs make a number of legal arguments against the rule that yield spread premiums need not be separately disclosed.

Decision responds with two arguments: first, that the record is replete with documentation demonstrating that the fee was, in fact, a yield spread premium; and second, that the Plaintiffs' earlier characterization of the fee as a yield spread premium is a binding judicial admission.

Decision Reply Brief, 12-15.  As  to Plaintiffs' legal challenges, Decision points out that the case law and regulations do not require separate disclosure of this type of fee.  *Id.*, 15-16

*Judicial Admission*

The Court takes up first the question of whether the Plaintiffs are bound by their earlier characterization of the fee as a yield spread premium.  "Judicial admissions are admissions in pleadings, stipulations, etc. which do not have to be proven in the same litigation." *Giannone v. U.S. Steel Corp.,* 238 F.2d 544, 547 (3d Cir.1956). "It has been held that judicial admissions are binding for the purpose of the case in which the admissions are made including appeals, and that an admission of counsel during the course of trial is binding on his client." *Glick v. White Motor Co.,* 458 F.2d 1287, 1291 (3d Cir.1972) (citations omitted).  "[T]o be binding, judicial admissions must be unequivocal." *Id. citing Oscanyan v. Arms Co.*, 103 U.S. 261, 26 L.Ed. 539 (1880); *see also Gerlach v. Volvo Cars of North America*, 1997 WL 129004 *4 (E.D.Pa.) (noting that factual allegations plead by plaintiff in original complaint constitute judicial admissions)

In this case, the Complaint clearly characterizes the second broker fee as a yield spread

premium:

> An examination of the loan documents at this time reveals that the
> Plaintiffs were charged very high fees for a great many alleged
> purposes.  Most of the charges on the Settlement Statement should
> have been disclosed as part of the "Finance Charge" in this
> transaction, but it appears that they were not.  For example, the
> Plaintiff were charged $2883.99 by MMS directly in addition to a
> "yield spread premium" of $2385 paid to MMS by Decision One
> but indirectly paid by the Plaintiffs…

Complaint, ¶ 7.  This characterization in unequivocal and without qualification.  Neither has the

Complaint been amended.  Therefore, the Court will deem the question of whether that fee was a

yield spread premium to have been admitted.

*Does the Record Demonstrate*
*that the Additional Broker Fee*
*Was a Yield Spread Premium?*

Yet even aside from what is pleaded, the record contains overwhelming, irrefutable

evidence that the second fee was, in fact, a yield spread premium.  Attached to Decision's Reply

Brief are loan documents which support this finding.  The Mortgage Loan Origination

Agreement spelled out for the borrowers the various ways in which the broker might be paid.

This included an explanation of a yield spread premium.  *See* Decision Reply Brief, Ex. D.  The

Notice to Loan Applicant Regarding Mortgage Broker Compensation advised the borrowers that

the broker would be paid by the lender who, in turn, would charge the borrower a higher rate of

interest.  *See id.*, Ex. C.  The Acknowledgment of Loan Terms and Benefits (also dated

November 5) disclosed "Broker Fees Paid By Lender ($2,385.00)."  *Id.* Ex. F.  The Borrowers'

Authorization and Consent to Payment of Fees to Mortgage Brokers is even more explicit: it

"authorizes, directs and consents" to the lender paying the broker a fee referred to as a "yield

spread premium." *See id.*, Ex. E.[11]  Finally, the HUD-1 Settlement Statement discloses the

additional broker commission at Line 811 with the acronym "PBL," meaning "paid by lender."

*See* Complaint, Ex. B.  This charge even prompted the Debtor to inquire about it at the closing.

The Debtor recalled at his deposition having received an explanation that the fee was being paid

by the lender.  *See* Escher Dep. @ 45:1-5, Decision's Brief, Ex. 5.  All of this evidence supports

Decision's claim that the additional fee was a yield spread premium.  The burden of proof is

therefore shifted to Plaintiffs to sustain the issue.

        For their part, Plaintiffs offer no contrary evidence but are content to dispute what

Defendants offer.  They argue first that there is nothing to prove that the additional fee caused

the interest rate on the loan to increase.  According to Mr. Escher, the mortgage broker told him

that the lender would pay the additional broker fee, but did not indicate that such fee would

affect the terms of the loan.  *See* Escher Affidavit, ¶7, attached to Plaintiffs' Brief.  Therefore,

the Plaintiffs conclude, there is no proof that the fee in question was a yield spread premium.

The Court finds this statement to be wholly disingenuous.  From the inception of the loan

process through closing, Plaintiffs' received disclosures that an additional fee would be paid to

the broker by the lender and that the ultimate cost of such fee would be borne by the Plaintiffs

via an enhanced rate of interest.  These documents were signed by the Debtor Plaintiff thereby

acknowledging receipt.  *See* Decision Reply Brief, Ex C - F.  He is also charged with the

knowledge of the contents of those documents.  *See Tran v. Metropolitan Life Insur. Co.*, 408

F.3d 130, 137 (3d Cir. 2005) ("[I]n the absence of proof of fraud, 'failure to read [the contract] is

an unavailing excuse or defense and cannot justify an avoidance, modification or nullification of

---

[11] Each such document bears the signature of the Debtor Plaintiff.

the contract or any provision thereof.'") *quoting Standard Venetian Blind Co. v. American Empire Insur. Co.*, 503 Pa. 300, 305, 469 A.2d 563, 566 (1983).  A party is obligated by the terms of the contract which the party signs.  *Childers Products Co., Inc. v. Baxter*, 1989 WL 41344 *6 (E.D.Pa.); *see also Colonial Beef Co. v. Hardimon*, 1997 WL 634371 *5 (E.D.Pa.) (holding that one is legally bound to know the terms of the contract he entered into citing *Montgomery v. Levy*, 406 P.a 547, 550, 177 A.2d 448, 450 (1962)).  At the settlement, the additional fee was itemized as having been paid by the lender.  *See* HUD-1A attached to Complaint as Ex. B.  Plaintiffs have never disputed that the lender paid that fee; nor have they maintained that it was a gratuitous transfer.  Given those circumstances, Plaintiffs had to expect to be responsible for it somehow.  If they were not going to pre-pay that fee,[12] then it would have to be made up as part of the interest on the loan.  There is simply no other conclusion to be drawn from this record.  Plaintiffs' denial of this is self-serving and without weight.  For the same reason, Mr. Escher's affidavit is without probative value.  It is nothing more than the "metaphysical doubt" that the Third Circuit admonished against in *Matsushita*, *supra*.

　　　Equally unpersuasive is the Plaintiffs' argument that the enhanced interest was not disclosed to them.  That is simply an incorrect statement: the yield spread premium is a component of interest due on the note.  Interest is disclosed as part of the finance charge which is set forth in the TILA Disclosure Statement.  *See* Complaint Ex. A.  Although the yield spread premium serves to increase the rate of interest, a lender is not required to break down the

---

[12] That they weren't is demonstrated by the Settlement Sheet.  It itemizes settlement charges which total $9794.99; however, the "Total Settlement Charges" on the bottom of the sheet reads "$7409.99."  The differential between the two figures is $2385 which is equal to the amount of the Broker Compensation PBL, paid by lender.  Thus only $7409.99 of settlement fees was paid directly by the borrowers.  That means that the $2385 was paid by the lender, who in turn, passed the cost onto the borrower in form of a higher interest rate.

components of the finance charge to disclose the separate existence of the yield spread premium

as a component of the finance charge.  *See Noel v. Fleet Finance, Inc*., 34 F.Supp.2d 451, 457

(E.D.Mich.1998)  On this record, then, the Court concludes that the yield spread premium was

sufficiently disclosed.

*Plaintiff's Legal Objection as
to How the Yield Spread
Premium is Disclosed*

The Plaintiffs next argue that as a matter of policy, a yield spread premium should be

separately disclosed as a finance charge.  The Plaintiffs' premise is that while a broker is

supposed to get the best possible interest rate for the borrower, the broker is paid a premium by

the lender who in turn, passes that cost on to the borrower via an enhanced rate of interest.

Plaintiffs' Brief, 6-7.  The problem with that argument is that it is completely unsupported by

applicable law.  The case law, regulations and official commentary all permit the payment of the

yield spread premium without separate disclosure of that fee as a finance charge.  Plaintiffs offer

a number of cases to support their argument but none is apposite.  *Smith v. Equicredit Corp*.[13]

involved a statute of limitations challenge.  *See* 2002 WL 32349872 *2.   The holding in

*Vandenbroeck v. Commonpoint Mortgage Company*[14] is precisely the opposite of what Plaintiffs

cite it for.  22 F.Supp.2d at 685 (holding that back-end fee which equated with a yield spread

premium was not required to be disclosed as a finance charge.)  Equally unhelpful are the

remaining cases.[15] The issue in each was whether a yield spread premium is included in the

---

[13] 2002 WL 32349873 (E.D.Pa.)

[14] 22 F.Supp.2d 677 (D.Mich.1998)

[15] *Sigle v. Canton Home Improvement*, 310 B.R. 303 (Bankr.N.D.Miss. 2004); *In re Bell*, 309 B.R. 139 (Bankr.E.D.Pa.2004); and *In re Webster*, 300 B.R. 787 (Bankr.W.D.Okla.2003).

16

calculation of points and fees necessary to determine if loan in question was a "high cost"

mortgage under HOEPA. *Sigle* and *Bell* held that such a fee is not included in the calculation

(310 B.R. at 307; 309 B.R. at 153), while *Webster* concluded that they were. 300 B.R. at 801.

Regardless of the discrepancy among those three cases, they pertain to HOEPA loans and not

TILA finance charge disclosures. In other words, they simply are inapposite.

As to the cases offered by Decision as apposite, the Plaintiffs assert that their value is

qualified. They note that two are on appeal while the third settled. Plaintiffs' Brief, 7. Exactly

how that status undermines their authority is not explained. It may very well come to pass that

the trial court rulings may be reversed on appeal, but until then their *persuasive* value remains

unaffected. *See Keeley v. Loomis & Fargo & Co.*, 183 F.3d 257, 269 n.9 (3d Cir.1999) (noting

that trial court decision is persuasive, not binding, authority.) Neither would settlement of an

adverse ruling affect precedent. The Third Circuit has held that litigants who settle their dispute

while an appeal is pending may not condition settlement upon vacating the adverse ruling.

*Clarenden, Ltd v. Nu-West Industries*, 936 F.2d 127, 129 (3d Cir.1991). For all of these reasons,

the Court does not find the Plaintiffs' legal arguments to be persuasive.

*Disclosure of Title Charges*

The Court turns its attention now to the Plaintiffs' claim that the charge for title insurance

should have been disclosed as a finance charge. With regard to title charges,[16] the statute

provides that:

> The following items, when charged in connection with any
> extension of credit secured by an interest in real property, *shall not*
> *be included* in the computation of the finance charge with respect

---

[16] Plaintiffs are no longer pursuing the claim that the notary fees should have been disclosed. Plaintiffs'
Brief, 3.

to that transaction:

(1) Fees or premiums for title examination, title insurance, or
similar purposes.

15 U.S.C. § 1605(e)(1) (emphasis added).  This section would appear, then, to exclude title-

related charges.  The applicable regulation, however, qualifies that exclusion:

(c) *Charges excluded* from the finance charge. The following
charges are not finance charges:
…
(7) Real-estate related fees.  The following fees in a transaction
secured by real property or in a residential mortgage transaction, *if
the fees are bona fide and reasonable in amount:*

(i) Fees for title examination, abstract of title, *title insurance*,
property survey, and similar purposes.

12 C.F.R. § 226.4(c)(7)(I) (emphasis added).  As to the title insurance charges, they need not be

disclosed so long as they are both legitimate and reasonable.  Where, as here, the statute and

Regulation Z are at odds, it is the regulation which controls.  *See Ford Motor Credit Co. v.

Milhollin*, 444 U.S. 555, 566, 100 S.Ct. 790, 797 , 63 L.Ed.2d 22 (1980) ("Congress has

specifically designated the Federal Reserve Board and staff as the primary source for

interpretation and application of truth in lending law").

The Plaintiffs allege that the charge for title insurance should not have exceeded $691.88.

Complaint ¶ 7.  Decision responds that the amount charged was the appropriate amount as

allowed under Pennsylvania law.  Decision Brief, 8-11.  Courts generally assess the

reasonableness of a title insurance premium "through comparison of the disputed charges with

the prevailing rates of the industry in the locality."  *Jones v. Aames Funding Corp*., 2006 WL

2845689 *5 (E.D.Pa.) *quoting Johnson v. The Know Financial Group*, 2004 WL 1179335 *6 n. 5

(E.D.Pa.2004).  Courts often use the Manual of the Title Insurance Rating Bureau of

18

Pennsylvania (the "Manual") as the gauge for determining the reasonableness of title insurance

rates in Pennsylvania.  *Id.; see also Oscar v. Bank One,* 2006 WL 401853 *6 (E.D.Pa.) (using

Manual to determine reasonableness of title insurance charge); *Stump v. WMC Mortgage Corp.,*

2005 WL 645238 *5 (E.D .Pa.) ("any fee charged for title insurance which exceeds the fee

authorized by the Manual ... is unreasonable and must be disclosed as a finance charge").

The Manual identifies the maximum allowable rate of insurance in 2003 on a $238,500[17]

loan as $1553.75.  *See* Decision's Brief, Ex. 3, Addendum A (p.3) to Manual.  Next to that

"basic rate," the Manual identifies the "reissue" rate of title insurance on such a loan as

$1398.38.  *Id.*  A borrower is entitled to the reissue rate for the same property for which title was

insured  during the previous 10 years where "evidence of the earlier policy is produced." *Id.,* §

5.3.  For a refinance of a loan extended within previous three years, a rate equal to 80% of the

reissue rate applies is charged.  *Id.,* § 5.6.

Plaintiffs claim that when they refinanced with Decision, they had an existing title

insurance policy which entitled them to a rate equal to 80% of the reissue rate.  Plaintiffs' Brief,

9-10.  Decision responds that they were not furnished with proof of an existing policy and,

therefore, Plaintiffs were properly charged the "basic rate" for title insurance.  Decision Brief, 8-

11.  Plaintiffs counter that they were not required to furnish proof of a policy to obtain the

refinance rate.  They explain that evidence of a preexisting policy applies only to the

"reissuance" of a policy, and not a refinance.  *See*  Plaintiffs' Brief, 10.  Moreover, they add,

Decision knew or should have known of the existence of title insurance on the property.  *Id.*

The first question which the Court must address is which party bears the burden of proof

---

[17]That is the amount of the loan.  *See* Complaint, Ex. B, Line 1600 (Loan Amount)

as to preexisting title insurance?  Decision cites a number of cases from this District which hold

that the lender properly charged the basic rate for title insurance where the borrower failed to

provide evidence of existing title insurance at closing.  Decision Brief, 11 *citing cases*.

Implicitly, that would place the evidentiary burden on the Plaintiffs.  For their part, the Plaintiffs

rely on a single case, *Strong v. Option One Mortgage Corp.* (*In re Strong*), 356 B.R. 121

(Bankr.E.D.Pa. 2004) *aff'd* 2005 WL 1463245 (E.D.Pa.).  According to the Plaintiffs,

Bankruptcy Judge Fox's holding in *Strong* "put to rest any contention that the borrower had any

burden of producing evidence to support the presence of title insurance in a prior transaction

because the lender would clearly have superior access to information about the presence of title

insurance in the prior transaction than would the borrower."  Plaintiff's Brief, 11.   In reviewing

that case, the Court finds Plaintiffs to have grossly mis-characterized both its holding and import.

While Judge Fox did, indeed, place the burden of proof as to existing insurance on the lender,

that ruling was premised on the facts of that particular case:

> [r]egarding the reissue rate, however, the defendant was in the
> superior position, vis-a-vis the plaintiffs, to know that th[e] lower
> rate was available upon production of the plaintiffs' prior title
> policy.
>
> The defendant was sufficiently familiar with the [prior] loan to
> know that a July 1998 title policy existed: the HUD-1 form
> obtained by the defendant from ContiMortgage concerning that
> prior loan transaction clearly shows purchase of title insurance
> from Stewart Title Company ($469.75) plus endorsements
> ($150.00). [citation omitted]. The defendant also had notice that it
> could obtain a reissue rate for the plaintiffs by producing the title
> policy, as the title commitment offered by GAC stated: "In order to
> receive a reissue rate for title insurance, GAC requires a copy of
> the schedule A and B from the previous title insurance policy be
> faxed to our office."
>
> Furthermore, the defendant conditioned the loan upon the
> plaintiffs' purchase of title insurance; and the defendant asserted a

20

> right to obtain such insurance through GAC and then seek
> reimbursement from plaintiffs' loan proceeds. (The plaintiffs were
> not afforded the option to obtain title insurance in their own.) In so
> doing, the defendant assumed the duty to the plaintiffs of advising
> the plaintiffs to provide the prior title policy to GAC in order to
> obtain the lower, reissue rate.

356 B.R. at 159.  Two years later, Judge Fox was confronted with the identical cause of action.

*See In re Fields v. Option One Mortgage Corp. (In re Fields)*, Adv. No. 04-005, slip op., *aff'd*

2006 WL 2191342 (E.D.Pa.).  There, however, the limited amount of evidence caused the Court

to analyze the respective burdens of proof at some length:

> The plaintiff implicitly maintains in this proceeding that the lender
> has the obligation to insure that a borrower pays the lowest
> permissible title insurance charge ... I have previously held that,
> under certain circumstances, a lender may be responsible to charge
> a borrower the lowest rate for which she was eligible under
> Pennsylvania law. *See In re Strong,* 2004 Bankr.LEXIS 2363, at
> *94 (Bankr.E.D.Pa. Aug. 31, 2004) (*citing Johnson,* 2004 WL
> 1179335, at *7), *affirmed on other grounds,* 2005 WL 1463245 (E.D.Pa.2005)
>
> The notion that a lender has some evidentiary burden to
> demonstrate the reasonableness of loan charges will often comport
> with the general approach of placing the burden of proof on the
> party with the "best means of proof on a given issue at his
> disposal.*"  In re Burwell*, 107 B.R. 62, 67 (Bankr.E.D.Pa.1989)
> (*quoting In re Jordan,* 91 B.R. 673, 684 (Bankr.E.D.Pa.1988)).
> *See Green Tree Fin'l Corp. v. Randolph,* 531 U.S. 79, 96, 121
> S.Ct. 513, 148 L.Ed.2d 373 (2000) (where fairness so requires,
> burden of proof of a particular fact may be assigned to "party who
> presumably has peculiar means of knowledge" of the fact) (*quoting*
> 9 J. Wigmore, Evidence § 2486 (J. Chadbourn ed., rev. ed.1981)).
> For many types of charges, i.e., courier fees and broker's fees, the
> lender will have greater access to marketplace information to
> demonstrate the reasonableness of the fee.
>
> But it is also true that, typically, a plaintiff bears the burden of
> proving her claims.  *See Patterson v. Chrysler Fin'l Co.*, 263 B.R.
> 82, 89 (Bankr.E.D.Pa.2001) (plaintiff in adversary bears burden of
> proving by preponderance of evidence all elements of claims just
> as any plaintiff would in suit outside of bankruptcy). When
> considering the title insurance charge, the plaintiff has a greater

21

evidentiary burden in this proceeding than she has acknowledged.

*Id.* at 27-29.  While the parties in *Fields* stipulated that the plaintiff had in fact obtained title insurance with her prior mortgage (*id.*, 4), the Court found that "the evidence does not support a finding that the defendant knew or should have known at the time of the loan transaction that the plaintiff qualified for the lower insurance rate .... the plaintiff had at least an evidentiary burden of production on this point." *Id.* at 30.  At the very least, "if a borrower contends that a lender failed to obtain the lowest title insurance rate permitted by law, she has an affirmative burden to demonstrate that the lender knew or should have known of the facts justifying that lower rate." *Id.* at 31-32 (*citing Jones v. Aames Funding Corp.,* 2006 WL 2845689 *5-7 (E.D.Pa.)).  Two subsequent decisions from this District adopt the reasoning of *Fields*.  *See Madera v. Ameriquest Mortgage Co. (In re Madera)*, 2007 WL 521323 *8-11 (Bankr.E.D.Pa.); *Glauser v. Deutsche Bank National Trust Company (In re Glauser)*, 2007 WL 987305 *5 (Bankr.E.D.Pa.).  This Court finds the reasoning of *Fields* and the cases which have adopted it to be persuasive and will, therefore, be guided accordingly.  What evidence in the record is there that the lender knew of the existence of title insurance when it made the loan?

As it turns out, none.  Plaintiffs contend that the lender was in possession of the Settlement Statement from the Debtor's previous loan closing in September 2001.  Escher Affidavit, ¶9, attached to Plaintiffs' Brief; *see also* Plaintiffs' Brief, 10.  That statement, Plaintiffs continue, indicated to Decision that title insurance was in effect.  *Id.*  Decision hotly disputes that contention pointing out that the Settlement Statement from the September 2001 closing *was produced by the Plaintiffs in discovery*, and not by either of the Defendants. Decision Reply Brief, 9-10.  It appears that Decision is correct: the document was produced by

the Plaintiffs in the instant litigation.  The deposition of Mr Escher confirms this.  It begins with

Mr. Escher having acknowledging the production of those documents bearing the "stamp number

P-001 through P-0168.  See Escher Dep. attached as Ex. B to Countrywide Motion, @ 9.

Among those documents are two numbered P-0167 and P-0168.  *See* Ex. 25 to Escher

Deposition which is attached as Exhibit B to Countrywide Motion.  These two documents

constitute the settlement sheet from the September 2001 loan closing.  Plaintiffs offer no proof

that the lender had that information before this litigation.  There is, then, no evidence in the

record demonstrating that Decision knew of existing title insurance when it made the loan.[18]  On

that basis, the Court finds that the Plaintiffs were properly charged the basic rate for title

insurance.

*New Violations Raised*
*After Close of Discovery*

In their Brief, the Plaintiffs identify three fees not previously identified among those

costs which, they insist, should have been disclosed as finance charges: $25 for document

preparation; $25 for notary fees; $235 for Title policy END/CPL; and $40 for tax certifications.

Plaintiffs' Brief, 12.  Decision contends that these fees were neither alleged as finance charges in

the Complaint, disclosed in discovery nor mentioned by Mr. Escher when deposed.  Decision

Reply Brief, 16.  At the hearing, the Court pressed Plaintiffs' counsel as to how these new claims

could be raised.  T-13-17.  In particular, the Court inquired as to whether counsel had informed

Decision of these new claims prior to the close of discovery.  T-13.  Counsel insisted that he had

(T-14) only to contradict himself three days later in a letter written to the Court.  *See* Letter of

---

[18] Neither is there evidence that Mr. Escher told Decision that he had title insurance; that he knew who
issued the prior policy or what it was for; or that he has ever produced a copy of that other policy.  *See*
Escher Dep. @ 37-39, attached to Decision Brief, Ex. 5.

Plaintiffs' counsel dated April 6, 2007.  What right do the Plaintiffs have at this juncture of the proceeding to raise these new claims?

The answer is none.  Courts have been reluctant to allow plaintiffs to add new theories of liability after summary judgment arguments have been completed.  *See Speziale v. Bethlehem Area Sch. Dist.,* 266 F.Supp.2d 366, 371 n. 3 (E.D.Pa.2003) ("Plaintiff's counsel cannot reasonably expect to amend the complaint after the close of discovery merely by raising new arguments in the responsive papers" [to a motion for summary judgment].); *OTA Ltd. P'ship v. Forcenergy, Inc.,* 237 F.Supp.2d 558, 561 n. 3 (E.D.Pa.2002) (holding that a new claim that was first raised in opposition to a motion for summary judgment was "too late"); *Bulkoski v. Bacharach, Inc.,* 1 F.Supp.2d 484, 487 n.6 (W.D.Pa.1997) (holding that after a summary judgment argument, "[i]t is too late for plaintiff to change his theory of the case"), *aff'd,* 149 F.3d 1163 (3d Cir.1998) (table decision); *Bakare v. Pinnacle Health Hospitals, Inc*., 469 F.Supp.2d 272, 296 (M.D.Pa.2006) (noting that a party is not permitted to raise new claims in opposition to a Rule 56 motion).  One Court has explained the rationale behind this rule:

> In *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 512, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) the Supreme Court has mandated a liberal pleading standard for civil complaints under Federal Rule of Civil Procedure 8(a). This standard however does not afford plaintiffs with an opportunity to raise new claims at the summary judgment stage. Indeed, the "simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Id.* Efficiency and judicial economy require that the liberal pleading standards under *Swierkiewicz* and Rule 8(a) are inapplicable after discovery has commenced. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed.R.Civ.P. 15(a).  A plaintiff may not amend her complaint through argument in a brief opposing summary judgment.  *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir.1996).

*Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314-15 (11ᵗʰ Cir.2004). This Court will be guided accordingly. If Plaintiffs intend to press these new TILA claims, then they must first obtain leave to amend their pleading.

*Assignee Liability*
*for the TILA Claims*

The Court's focus now shifts from Decision—the original lender—to Countrywide—the first assignee.[19] Like Decision, Countrywide challenges the substantive TILA claims. Countrywide Brief, 8-9. It adds, as well, the alternative argument that even assuming the original lender violated TILA, such liability may not be imputed to Countrywide because it is an innocent purchaser. *Id.*, 10-12 While this Court's finding, *supra*, that no TILA violation occurred would appear to moot the issue of assignee liability, the record would appear sufficient to allow the Court to make a finding on that issue.

TILA § 1641 addresses the circumstances under which an assignee may be liable for violations committed by the prior holder. For loans secured by real estate, the statute provides as follows:

> (e) Liability of assignee for consumer credit transactions *secured by real property*
>
> (1) In general

---

[19] And for all that the Court can tell from the record, Countrywide may yet be the holder. The parties stipulation indicates that Countrywide assigned the note to Bank of New York, but the record contains no independent evidence of that. Neither have the Plaintiffs moved to amend the Complaint to add BONY as a defendant. The Court has discretion to allow an amendment to conform the pleadings to the proofs (*see* F.R.C.P. 15(b), made applicable by B.R. 7015); however, such discretion will not be exercised *sua sponte*. *See United States v. 47 Bottles, More or Less, Jenasol RJ Formula 60*, 320 F.2d 564, 573 (3d Cir.1963) (explaining that discretion of trial judge to allow amendment to pleading to conform to evidence, while broad, is not unlimited and cannot be exercised in such manner as to result in substantial prejudice to party. Moreover, such discretion certainly may not be exercised over a non-party.

> Except as otherwise specifically provided in this subchapter, any
> civil action against a creditor for a violation of this subchapter, and
> any proceeding under section 1607 of this title against a creditor,
> *with respect to a consumer credit transaction secured by real
> property* may be maintained against any assignee of such creditor
> only if--
>
> (A) the violation for which such action or proceeding is brought is
> *apparent on the face of the disclosure statement* provided in
> connection with such transaction pursuant to this subchapter; and
>
> (B) the assignment to the assignee was voluntary.

15 U.S.C. § 1641(e)(1) (emphases added); *see also Ramadan Chase Manhattan Corp.*, 229 F.3d

194, 199 (3d Cir.2000) ("Section 1641(e) creates assignee liability for TILA violations in

transactions *secured by real property*.")   And importantly for present purposes, §1641(e)

provides its own definition of the phrase "apparent on the face of the disclosure statement:"

> For the purpose of this section, a violation is apparent on the face
> of the disclosure statement if–
>
> (A) the disclosure can be determined to be incomplete or
> inaccurate by a comparison among the disclosure statement, any
> itemization of the amount financed, the note, or any other
> disclosure of disbursement....

15 U.S.C. § 1641(e)(2).[20] One commentator explains what documents the assignee is required to

examine:

> A violation is only "apparent" for real estate transactions if it fits
> squarely into one of the two parts of the definition.  The first part
> of the definition is if "the disclosure statement can be determined
> to be incorrect or inaccurate by a comparison among the disclosure
> statement, any itemization of the amount financed, the note, or any

---

[20] There is a significant—and meaningful—distinction between this subsection and subsection (a).  This
definition does not contain the critical clause "or other assigned documents" found in subsection (a).
Subsection (a) applies to assignment of loan not secured by real estate.  As the Third Circuit has pointed
out, "[s]ection § 1641(e) was adopted 15 years after § 1641(a), and it therefore demonstrates Congress
knows how to adopt a different formulation of 'apparent on the face' if it desires."  *Ramadan*, 229 F.3d at
200.

> other disclosure of disbursement." This latter document would
> most likely be a HUD-1 settlement statement. These apparently
> are the only documents that Congress thought mortgage assignees
> should be responsible for examining. If a disclosure is apparent
> from another document contained in the assigned mortgage file,
> the assignee is protected, even if just a cursory review of the other
> document would have revealed the error.

Rohner & Miller, *Truth in Lending*, ¶ 12.06[2]*[b]* ABA (2000). At the deposition of Mr. Escher,

Countrywide took pains to establish that the Plaintiffs were not accusing Countrywide of having

actively violated TILA. Countrywide Brief, 8 quoting Escher Dep. @ 120-122. Any liability on

the part of Countrywide, then, would have to be vicarious. The effect of that, Countrywide

concludes, is to place "a very limited burden on the assignee." *Id.* 10. They understand

themselves to be required to look only at the face of the TILA disclosure statement, the

itemizations of the amount financed, the note, and other disbursement disclosure documents. *Id.*

None of these document alerted Countrywide that something was amiss. *Id.*, 11. As to the

charge for title insurance, Plaintiffs' right to a lower rate was dependent on the existence of a

pre-existing policy. Countrywide, however, was not required to look beyond the HUD-1A to

determine if one existed.

The Court finds Countrywide to have correctly stated the applicable standard. Courts

confronted with this issue have held that the assignee need not look beyond the TILA disclosures

to take the loan in good faith. *See Murry v. America's Mort. Banc., Inc.*, 2004 WL 5010145 *4

(N.D.Ill.); *Green v. Levis Motors, Inc.*, 179 F.3d 286, 295 (5th Cir.1999); and *Fielder v. Credit

Acceptance Corp.*, 98 F.Supp.2d 1104, 1107-08 (W.D.Mo.2000). So even if the Court were to

find that the lender failed to disclose the finance charge, nothing in this record, establishes

scienter on Countrywide's part. For that reason, the record does not support the imputation of

such a violation to Countrywide.

27

*The Credit Services Act
and Loan Broker Trade
Practices Regulations Claims*

Count III is directed against all of the Defendants.  It begins by alleging that MMS is

guilty of common law fraud and breach of fiduciary duty.  That subjects MMS to liability under

the Pennsylvania Credit Services Act (CSA) and Loan Broker Trade Practices Regulations

(LBTPR).  *See* Complaint, ¶ 19.  Plaintiffs seek to impute that wrongdoing (and resulting

liability) to Decision, MERS, and Countrywide.  *Id*., ¶ 20.  To this count, both Decision and

Countrywide make the same argument: neither statute applies to them.  They point out that the

CSA applies to "credit services organizations" while the LBTPR applies to "loan brokers." Both

capacities are defined specifically in their respective statutes and there is no evidence that either

Defendant acted in either manner.  Decision Brief, 15; Countrywide Brief, 16-18.  Countrywide

adds that there is no legal duty on the part of the lender to have protected the borrower from any

wrongdoing committed by the broker.  Countrywide Brief, 19.   All of this, however, is now

moot: in their Brief, the Plaintiffs now stipulate that Count III is directly only at MMS, the

Defendant mortgage broker.  *See* Plaintiffs' Brief, 2.  As to Decision and Countrywide, then,

summary judgment will be granted in their favor as to Count III.

*The UDAP Claim*

The final count is also directed against all of the Defendants.  It alleges that

> having collaborated to violate the TILA and the CSA, [the
> Defendants] engaged in a concerted plan to purport to provide
> financial services with an intent not to provide same as
> represented, knowingly misrepresented that such services were
> needed, and engaged in fraudulent and deceptive conduct which
> was calculated to and did create confusion and misunderstanding
> in the mind of susceptible consumers such as the Plaintiffs and
> have violated the LBTP in violation of the Pennsylvania Uniform
> Trade Practices and Consumer Protection Law… "

28

Complaint, ¶ 22.  The best that the Court can make out of this very long sentence is that the

violations of TILA, the CSA and LBTPR alleged in the preceding counts constitute per se

violations of the Pennsylvania Uniform Trade Practices and Consumer Protection Law,[21] 73 P.S.

§ 201-1 et seq.  In other words, Counts I and III furnish the operative premise for the UDAP

count.  *See In re Milbourne*, 108 B.R. 522, 544 (Bankr.E.D.Pa.1989) ("a violation of TILA may

also constitute a violation of UDAP"); *see also In re Barker*, 251 B.R. 250, 260

(Bankr.E.D.Pa.2000) ("[A]ny violations of Pennsylvania's Credit Services Act (CSA) are

deemed to be violations of the state's UDAP statute"); *and see also Kimberton Chase Realty*

*Corp. v. Main Line Bank*, 1997 WL 698487 *9 (E.D.Pa.) (holding that UDAP claim premised on

LBTPR violation survives motion to dismiss)

      Decision argues that this claim must fail as to it because it is based on the previous count.

Decision Brief, 15.  That count being unsustainable as against Decision because it is neither a

"credit services organization" nor a "loan broker," it must likewise fail here.  Countrywide

contests any contention of collaboration with the other Defendants.  Countrywide Brief, 20. They

point to Mr. Escher's deposition testimony wherein he essentially admits that such an allegation

is without foundation.  *See* Countrywide Brief, 20-21.  They add that because the underlying

TILA, CSA, and LBTPR claims are without basis in either fact or law, the derivative UDAP

claim must necessarily fail.  *Id.* 22.

      The Court is in agreement with these Defendants, but not for the reasons offered.  The

Plaintiffs have since abandoned their claims that either Decision or Countrywide is liable to them

---

[21] The Court will employ the shorter acronym since it is generically a law regulating *u*nfair or *d*eceptive *a*cts or *p*ractices, is referred to hereinafter as "UDAP").

under the CSA or LBTPR.  Plaintiffs' Brief, 2.  The Court has already found the TILA claim to

be unsupported by this record; therefore, there are no underlying claims upon which per se

UDAP liability may be based.  *See Jones v. Aames Funding*, *supra* *11 (dismissing derivative

UDAP claims based on lack of merit as to underlying TILA and HOEPA claim; *see also Strang,*

*supra*, *8 (dismissing per se UDAP claim due to failure of underlying TILA, ECOA and CSA

claims).  As to Countrywide and Decision, then, summary judgment must be granted in their

favor as to Count IV.

*Summary*

Summary judgment will be granted in favor of Decision, Countrywide and MERS[22] as to

all four counts of the Complaint.  Because the record demonstrates that the yield spread premium

and title insurance charges were disclosed in accordance with TILA, Count I must be dismissed.

Count II has since been abandoned.  *See* Plaintiffs' Brief, 2.  Plaintiffs are no longer pressing the

claims in Count III against either Decision or Countrywide.   Finally, the claim of UDAP

liability derives from the TILA, CSA and LBTPR claims.  Those claims having been found to be

either abandoned or unsupported as to the moving parties, the UDAP claim must likewise

necessarily be dismissed as to them.


By the Court:

_____
Stephen Raslavich
United States Bankruptcy Judge

Dated:  <u>June 12, 2007</u>

---

[22] Judgment is entered in MERS' favor for the reasons set forth in footnote 8, *supra*.

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| IN RE | : CHAPTER 13 |
| | : |
| JAMES C. ESCHER | : |
| DEBTOR(S) | : BANKRUPTCY NO. 05-31711 SR |
| _____ | : |
| JAMES C. ESCHER AND VIOLA ESCHER | : |
| PLAINTIFFS | : |
| V. | : |
| DECISION ONE MORTGAGE COMPANY, LLC | : |
| MORTGAGE ELECTRONIC REGISTRATION | : |
| SYSTEMS, INC., COUNTRYWIDE HOME | : |
| LOANS, INC., AND MORTGAGE | : |
| MANAGEMENT SPECIALISTS | : |
| DEFENDANTS | : ADVERSARY NO. 05-607 |
| _____ | : |

# ORDER

**AND NOW**, upon consideration of the Motions for Summary Judgment filed by Decision One Mortgage Company, LLC, and Countrywide Home Loans, Inc., and Mortgage Electronic Registration Systems, Inc., the Opposition of the Plaintiffs thereto, after hearing held on April 3, 2007, after submission of briefs, and for the reasons set forth in the attached Opinion, it is hereby:

**ORDERED,** that the Motions are granted and that summary judgment is entered in favor of all three movants and against the Plaintiffs.  Accordingly, the Complaint is dismissed as to those three defendants.

By the Court:

_____
Stephen Raslavich
United States Bankruptcy Judge

Dated:  June 12, 2007

Interested Parties:

George Conway, Esquire
Office Of The U.S. Trustee
833 Chestnut Street
Suite 500
Philadelphia PA  19106

Counsel for Plaintiffs

David A. Scholl, Esquire
REGIONAL BANKRUPTCY CENTER
OF SOUTHEASTERN PENNSYLVANIA
6 St. Albans Avenue
Newtown Square, PA 19073


Counsel for Decision One

Andrew K Stutzman, Esquire
STRADLEY RONON STEVENS
& YOUNG LLP
2600 One Commerce Square
Philadelphia, PA 19103

Counsel for Countrywide

Martin C. Bryce, Jr., Esquire
BALLARD, SPAHR, ANDREWS & INGERSOLL
1735 Market Street
51st Floor
Philadelphia, PA 19103