**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

05-00607

| | | |
|---|---|---|
| JAMES C. ESCHER, *et al.* | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 08-4791 |
| | : | |
| DECISION ONE MORTGAGE | : | FILED SEP 2 9 2009 |
| COMPANY, LLC, *et al.* | : | |
| | : | |

## ORDER

**AND NOW**, this 29th day of September, 2009, upon consideration of the Brief of
Appellants (Document No. 3), the Brief of Appellees Countrywide Home Loans, Inc. and
Mortgage Electronic Registration Systems, Inc. (Document No. 4), the Brief of Appellee
Decision One Mortgage Company, LLC (Document No. 5), the Reply Brief of Appellants
(Document No. 6), and after review of the record in the Bankruptcy Court, **IT IS ORDERED**
that the decision of the bankruptcy court is **AFFIRMED** in part, **VACATED** in part, and
**REMANDED** for further proceedings consistent with this Memorandum Opinion.

/s/ Timothy J. Savage
TIMOTHY J. SAVAGE, J.

**ENTERED**

SEP 2 9 2009

**CLERK OF COURT**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES C. ESCHER, *et al.* | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 08-4791 |
| | : | |
| DECISION ONE MORTGAGE | : | |
| COMPANY, LLC, *et al.* | : | |
| | : | |

FILED SEP 2 9 2009

## MEMORANDUM OPINION

Savage, J.                                               September 29, 2009

### *Introduction*

This bankruptcy appeal arises out of James and Viola Escher's ("the Eschers") claims that the lender failed to include certain fees in the finance charge calculation in violation of the Truth in Lending Act ("TILA") when they refinanced a mortgage loan. The Eschers are appealing from the grant of summary judgment in favor of the defendants and the denial of their request for leave to amend their complaint. Two issues pertain to the Bankruptcy Court's rulings with respect to the TILA claims challenging the reasonableness of a yield spread premium ("YSP") and a title insurance fee; and two relate to the denial of the Eschers' request to amend the complaint to expand the TILA claim to include three additional fees charged and to add Bank of New York ("BONY") as a defendant.

We shall affirm the Bankruptcy Court's judgment in part and vacate it in part for the following reasons. First, based on the plain language of the TILA and its implementing regulations, and on the reasoning of the Federal Reserve Board and courts in this Circuit, the Bankruptcy Court correctly held that the YSP in this case was not required to be separately disclosed as a finance charge because it was already included in the interest

rate.  Second, although it followed several district court opinions, the Bankruptcy Court did

not apply the correct legal standard to determine whether the borrowers were entitled to

the discounted refinance rate of title insurance.   Third, because one of the reasons the

Bankruptcy Court denied the Eschers' motion for leave to amend the complaint to add

BONY as a defendant was futility and we have determined that the Eschers can proceed

with one of the TILA claims, the Bankruptcy Court must reconsider its ruling on the motion

for leave to amend only as to adding BONY as a defendant.   Therefore, except with

respect to the TILA claim relating to the title insurance charge, we shall affirm the

Bankruptcy Court and remand the case for proceedings consistent with this memorandum

opinion.

### Procedural History and Factual Background

On November 5, 2003, through mortgage broker Mortgage Management Specialists

("MMS"), James and Viola Escher obtained a $238,500 mortgage loan from Decision One.

They refinanced an existing mortgage held by BNC Mortgage.  One month later, Decision

One sold the loan to Countrywide, which ultimately transferred its ownership interest to a

trust for which the Bank of New York ("BONY") is a trustee.  Countrywide continued to

service the loan.

On July 29, 2005, Mortgage Electronic Registration Systems, Inc. ("MERS"), as

Countrywide's nominee, filed a foreclosure action.  On September 1, 2005, James Escher

filed a Chapter 13 bankruptcy petition.  On September 29, 2005, he and his wife, Viola,

filed an adversary proceeding against Decision One, Countrywide, MMS and MERS.  They

sought: (1) rescission and damages under TILA for the defendants' failure to include

certain unreasonable or excessive fees in the finance charge, namely, the YSP, the title

2

insurance fee and the notary fee; (2) actual and statutory damages under the Real Estate

Settlement and Procedures Act ("RESPA") for failing to timely respond to the Eschers'

request for information about their loan; (3) damages under the Pennsylvania Credit

Services Act ("CSA"), Pennsylvania Loan Brokers Trade Practices Regulations ("LBTPR"),

and the Unfair Trade Practices and Consumer Protection Law ("UTPCPL").

Decision One, Countrywide and MERS moved for summary judgment. In their

opposition, the Eschers abandoned several claims. They withdrew their RESPA claim,

limited their CSA and LBTPR claims to the broker, and withdrew their claim that the notary

fee was excessive under TILA. For the first time, in their opposition brief, the Eschers

identified three charges they contended should have been disclosed as finance charges:

a $25 document preparation fee; a $ 40 tax certification fee; and a $235 title endorsement

fee. *See* Eschers' Opp. Br. at 3, 12-13.

After holding oral argument, the Bankruptcy Court issued its Opinion and Order

granting the summary judgment motions in their entirety. *See In re Escher,* 369 B.R. 862

(Bankr. E.D. Pa. 2007) ("*Escher I*"). The court held that the defendants did not violate the

TILA because the YSP and the title insurance charge were accurately disclosed and

because the Eschers raised their new TILA claims improperly in response to a summary

judgment motion. *Id.* at 878-79, 882. It also granted the motions on the UTPCPL claim

because there were no underlying claims remaining upon which UTPCPL liability could be

based. *Id.* at 881-82.

Almost one month after the Bankruptcy Court granted summary judgment in favor

of the lender, assignee and nominee, the Eschers moved for leave to amend the

complaint. They sought to: add BONY as a defendant; add three new TILA claims they

3

first mentioned in their opposition brief to the summary judgment motions; reassert the

TILA claims regarding the unreasonableness of the YSP, title insurance and notary fees,

which were dismissed against the defendants in *Escher I*; reassert their UTPCPL claim,

which was dismissed against the defendants in *Escher I*; and reassert their RESPA claim,

which they had withdrawn in their response to the summary judgment motions.

The Bankruptcy Court held oral argument on the motion for leave to amend. On

September 28, 2007, the Bankruptcy Court issued an Opinion and Order denying the

motion, except it allowed the Eschers to amend their UTPCPL claim against the broker

(who was the only remaining defendant in the case). *See In re Escher*, 2007 WL 2892008

(E.D. Pa. Sept. 28, 2008) ("*Escher II*"). The Bankruptcy Court determined that the Eschers'

dilatory conduct and questionable tactics in filing the motion to add new TILA claims and

reassert old claims dictated that it be denied. *Id.* at *1. It also denied the request to add

BONY as a defendant because the claims to be asserted against BONY had been

dismissed, which rendered amendment futile. *Id.* at *8.

On September 4, 2008, the Bankruptcy Court approved the Eschers' settlement with

the broker. A week later, the Eschers filed their notice of appeal.

### Issues on Appeal

Specifically, the issues that the Eschers raise in this appeal are:

1. Whether the Bankruptcy Court improperly entered summary judgment in favor

of the defendants on the Eschers' claim that the mortgage broker compensation paid in the

form of a YSP should have been disclosed as part of the finance charge;

2. Whether the Bankruptcy Court improperly entered summary judgment in favor

of the defendants on the Eschers' claim that the Eschers were overcharged for title

insurance, thereby requiring the title insurance fee to have been disclosed as part of the finance charge;

3.  Whether the Bankruptcy Court abused its discretion in denying the Eschers' request to amend the complaint to expand their TILA claim to include three additional charges (a $25 document preparation fee; a $40 tax certification fee; a $235 title endorsement fee) that should have been disclosed as part of the finance charge; and

4.  Whether the Bankruptcy Court abused its discretion in denying the Eschers' request to amend the complaint to add Bank of New York as a defendant.

### *Standard of Review*

A district court reviews a bankruptcy court's "legal determinations *de novo*, its factual findings for clear error, and its exercise of discretion for abuse thereof." *In re Reilly*, 534 F.3d 173, 175 (3d Cir. 2008) (citing *In re Trans World Airlines, Inc.*, 145 F.3d 124, 130-31 (3d Cir. 1998)).  Where the bankruptcy court's decision involves a mixed question of law and fact, we must break down the determination and apply the appropriate standard of review to each. *In re Montgomery Ward Holding Corp.*, 326 F.3d 383, 387 (3d Cir. 2003).

In this case, we review the Bankruptcy Court's legal determinations regarding the TILA violations, the YSP and the title insurance fees, *de novo*.

### *Background on TILA*

The Truth in Lending Act aims to ensure meaningful disclosure of credit terms and to protect consumers from inaccurate and unfair credit billing practices.  15 U.S.C. § 1601(a).  The TILA requires lenders to disclose the cost of credit to borrowers as a dollar amount. This is done by disclosing, among other things, the amount financed, the finance charge, the annual percentage rate, and the total sale price. 15 U.S.C. § 1638(a); 12

5

C.F.R. § 226.18. The "amount financed" and the "finance charge" together constitute the "total of payments." 15 U.S.C. § 1638(a)(5). The "finance charge" is the sum of all charges, minus certain exclusions, payable by the borrower and imposed by the creditor incident to the extension of credit. 15 U.S.C. § 1605(a).

The TILA and its implementing regulation, Regulation Z,[1] identify what fees are included in and excluded from the finance charge. 12 C.F.R. § 226.4. Examples of fees included in the finance charge are interest, points, credit report fees, and borrower-paid mortgage broker fees. 15 U.S.C. § 1605(a); 12 C.F.R. § 226.4(b). Examples of fees that are excludable from the finance charge are certain real-estate related fees, such as charges for title insurance, property appraisals and notary reports, provided they are bona fide and reasonable. 15 U.S.C. § 1605(e); 12 C.F.R. § 226.4(c)(7). Because only reasonable fees are excludable, any unreasonable amount must be included in the finance charge. 12 C.F.R. § 226.4(c)(7).

The disclosure requirements are strict. Failure to fully and accurately disclose has significant consequences. A borrower may rescind a loan when there has been an improper disclosure. 12 C.F.R. § 226.23(a).

The Eschers contend that Decision One should have included the yield spread premium and the title insurance fee in the prepaid finance charge, and that because these fees were not disclosed, they are entitled to rescission of the loan and damages resulting from the rescission. The Bankruptcy Court held that there was no obligation to disclose

---

[1] The Federal Reserve Board, the agency charged with administering the TILA, has promulgated regulations, known collectively as "Regulation Z," to implement the Act's mandates and methods of disclosure. *See* 12 C.F.R. Part 226.

those fees. We shall consider each charge separately.

### The Yield Spread Premium

The Eschers argue that the $2,385 yield spread premium ("YSP") paid by Decision

One to the broker was a component of the finance charge and, accordingly, should have

been included in the disclosed pre-paid finance charge. They contend that the Bankruptcy

Court erred when it determined that the YSP was not required to have been disclosed as

part of the finance charge.

Both the TILA and Regulation "Z" define "finance charge" to include certain broker's
fees:

> (6) *Borrower-paid* mortgage broker fees, including fees paid
> directly to the broker or the lender (for delivery to the broker)
> whether such fees are paid in cash or financed.

15 U.S.C. § 1605(a)(6) (emphasis added), and

> (3) Special rule; mortgage broker fees. Fees charged by a
> mortgage broker (including fees paid by the consumer directly
> to the broker or to the creditor for delivery to the broker) are
> finance charges even if the creditor does not require the
> consumer to use a mortgage broker and even if the creditor
> does not retain any portion of the charge.

12 C.F.R. § 226.4(a)(3).

A "yield spread premium" has been defined as:

> a bonus paid to a broker when it originates a loan at an interest
> rate higher than the minimum interest rate approved by the
> lender for a particular loan. The lender then rewards the broker
> by paying it a percentage of the yield spread (i.e., the
> difference between the interest rate specified by the lender and
> the actual interest rate set by the broker at the time of
> origination) multiplied by the amount of the loan.

*Parker v. Long Beach Mortgage Co.*, 534 F. Supp. 2d 528, 536 (E.D. Pa. 2008) (Sanchez,

J.) (citing *Escher I*, 369 B.R. at 870-71, which cites *Oscar v. Bank One, N.A.*, No. Civ. A.

7

05-5928, 2006 WL 401853, at *5 (E.D. Pa. Feb. 17, 2006) (Padova, J.)).

Although the Third Circuit has not addressed this issue, other persuasive authority

instructs that the TILA and its implementing regulations do not require lenders to disclose

a YSP as part of a loan's finance charge or to explain its impact on the interest rate, as

long as it is disclosed on the HUD-1. Relying on the plain language of the TILA and

Regulation Z, and the Federal Reserve Board's interpretation of Regulation Z, district and

bankruptcy courts in this district have held that the YSP need not be separately disclosed

because it is already included in the interest rate that is disclosed. *See, e.g., Parker*, 534

F. Supp. 2d at 536; *Abbott v. Washington Mut. Finance*, Civ. Action No. 05-4497, 2008 WL

756069, at *2 (E.D. Pa. Mar. 20, 2008) (Sanchez, J.); *Davis v. Deutsche Bank Nat'l Trust*

*Co.*, Civ. Action No. 05-CV-4061, 2007 WL 3342398, at *5 (E.D. Pa. Nov. 8, 2007) (Joyner,

J.); *Escher I*, 369 B.R. at 870-71; *Oscar*, 2006 WL 401853, at *5; *Strang v. Wells Fargo*

*Bank, N.A.*, No. Civ. A. 04-CV-2865, 2005 WL 1655886, at *5 (E.D. Pa. July 13, 2005)

(Joyner, J.); *Stump v. WMC Mortgage Corp.*, No. Civ. A. 02-326, 2005 WL 645238, at *4

(E.D. Pa. Mar. 16, 2005) (Joyner, J.). Although the YSP is a finance charge, the Federal

Reserve Board has concluded that it need not be disclosed as a pre-paid finance charge

pursuant to 15 U.S.C. § 1605(a)(6) because it is already included in the interest rate:

"Fees paid by the funding party to a broker as a 'yield spread premium,' that are already

included in the finance charge, either as interest or as points, should not be double

counted." 61 Fed. Reg. 26126, 26127 (1996). In addition, the Official Staff Interpretation

to Regulation Z states:

> Compensation paid by a creditor to a mortgage broker under
> an agreement is not included as a separate component of a
> consumer's total finance charge (although this compensation

> may be reflected in the finance charge if it comes from
> amounts paid by the consumer to the creditor that are finance
> charges, such as points and interest).

Official Staff Interpretation to 12 C.F.R. § 226, Supp. I, sec. 4(a)(3)-3.[2]

Based on these sources, courts in this district have uniformly held that the YSP was

properly excluded from the pre-paid finance charge. *See, e.g., Stump*, 2005 WL 645238,

at *4 (finding that a $1,100 YSP was properly excluded from the itemized pre-paid finance

charge on the TILA Disclosure Statement even though a YSP is a finance charge because

"the cost to the Plaintiffs is not imposed at settlement, but is instead paid out as interest

over the course of the . . . mortgage"); *Strang*, 2005 WL 1655886, at *5 ("[C]ourts in the

Eastern District of Pennsylvania have held that the yield spread premium is properly

excluded. . . . Specifically, courts have found that the yield spread premium is already

incorporated into the total finance charge as a higher interest rate and therefore should not

be double-counted.").

In this case, the HUD-1 Settlement Statement disclosed the additional broker

commission of $2,385 at Line 811 with the acronym "PBL," meaning "paid by lender."

Using the same reasoning as the other courts in this district, the Bankruptcy Court held that

because the amount of the YSP was added to the total loan amount, to be paid for as part

---

[2] Congress has specifically designated the Federal Reserve Board and its staff as the "primary source for interpretation and application of truth-in-lending law." *Aronson v. The People's Natural Gas Co.*, 180 F.3d 558, 562-63 (3d Cir. 1999) (quoting *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566 (1980)). The Court stated that Congress has "delegated expansive authority to the Federal Reserve Board to elaborate and expand the legal framework governing commerce in credit" in the context of the TILA, and that the Board has executed its responsibility by promulgating Regulation Z. *Ford Motor Co.*, 444 U.S. at 559-60. Similarly, "unless demonstrably irrational," Federal Reserve Board staff opinions construing TILA or Regulation Z "should be dispositive." *Id.* at 565-66. The Court has held that deference to the Federal Reserve Board and its staff interpretations is essential in the process of interpreting the Truth in Lending Act and Regulation Z. *Id.* at 565. Thus, the Federal Reserve Board's interpretation of the TILA is entitled to *Chevron* deference. *See Chevron, U.S.A., Inc. v. NRDC*, 467 U.S. 837 (1984) (an administrative agency's interpretation of a statute that it administers is generally accorded deference and will not be disturbed by a court).

of the interest on the loan, the YSP was included in the loan's finance charge. Because the YSP "should not be double-counted," it was not required to be separately disclosed in the prepaid finance charge. *Escher I*, 369 B.R. at 870-74.

On appeal, the Eschers assert two arguments why the Bankruptcy Court's determination on the YSP was incorrect. First, they contend that the record fails to show where in the finance charge the YSP is already included as interest. Second, they argue that not requiring separate disclosure of a YSP is bad policy.

With respect to the first argument, all of the cases in this district addressing the issue of proper disclosure of a YSP have found that if the amount of the YSP is disclosed on the HUD-1 settlement statement as a broker's commission paid by the lender, and the interest on the loan is disclosed on the TILA disclosure, this is sufficient evidence that the YSP is included in the interest rate. In this case, the amount of the YSP was disclosed on the HUD-1 settlement statement as a broker's commission paid by the lender and the interest on the loan was disclosed on the TILA disclosure statement.

The YSP was already disclosed as interest in documents other than the HUD-1 statement. For example, the Eschers received and signed the following disclosures: Notice to Loan Applicant Regarding Mortgage Broker Compensation, which advised them that the broker would be paid by the lender who, in turn, would charge the borrower a higher rate of interest; Acknowledgment of Loan Terms and Benefits, which disclosed "Broker Fees Paid By Lender ($2,385.00);" and Borrowers' Authorization and Consent to Payment of Fees to Mortgage Brokers, which "authorizes, directs and consents" to the lender paying the broker a fee referred to as a "yield spread premium." *See Escher I*, 369 B.R. at 872. At his deposition, James Escher testified that at closing, he inquired about the broker's

10

commission on the HUD-1 statement and was told it was a fee being paid by the lender. Thus, the Eschers' argument that the record does not show where in the finance charge the YSP is already included as interest necessarily fails.

The Eschers' policy argument must also fail. The Eschers contend that a YSP is a reward by the lender to the broker for convincing a borrower to accept an interest rate higher than the best rate available to that borrower. They state that no rational borrower would agree to a higher rate than the best rate available. They argue that full disclosure of all compensation a mortgage broker receives should be included in the finance charge.

Courts do not set policy. Even though we may agree that the practice of a broker, whom the borrower trusts to get the best deal, does not inform the borrower that he can obtain a lower interest rate, defies transparency and implicates a conflict of interest, we cannot intrude upon the prerogatives of Congress and the Federal Reserve Board.[3]

We agree with the reasoning of the courts in this district that have uniformly held that the TILA and Regulation Z do not require separate disclosure of a YSP paid by the lender to the broker because it would be double counting the YSP. Therefore, we shall affirm the Bankruptcy Court's determination on this issue.

### Title Insurance

Title insurance fees are excludable from the finance charge provided they are bona

---

[3] The opportunity to receive a yield spread premium commission from the lender creates a disincentive for the mortgage broker to obtain the best deal for his client, the borrower. It is a scenario ripe for fraud and deceit. An unscrupulous broker may take advantage of unsuspecting borrowers by failing to disclose to them that they can obtain a lower interest rate, and instead, sell them a higher interest rate for the broker's undisclosed financial advantage.

Congress and the Federal Reserve Board may wish to consider investigating this unregulated practice and passing legislation or promulgating regulations that prohibit the practice or, at least, require full disclosure to the borrowers that a lower rate is available.

fide and reasonable.   15 U.S.C. § 1605(e); 12 C.F.R. § 226.4(c)(7).   Because only reasonable fees are excludable, any unreasonable amount must be included in the finance charge. 12 C.F.R. § 226.4(c)(7).  The Eschers contend that they were improperly charged the "basic" rate of title insurance rather than the lower "refinance" rate.  They argue that because they were entitled to the lower rate, the title insurance charge is not reasonable and should have been included in the finance charge.  The defendants counter that the Eschers were not eligible for the "refinance" rate because they did not provide the lender at closing with proof of existing title insurance on their property.

The parties agree that the reasonableness of title insurance rates in Pennsylvania is established by the Manual of the Title Insurance Rating Bureau of Pennsylvania (the "Manual").  According to the Manual, the basic rate of insurance on the loan amount at issue in 2003 was $1,553.75 (see Manual, § 5.50); the "reissue" rate was 90% of the basic rate, or $1,398.38 (Manual, §§ 5.3, 5.50); and the refinance rate was 80% of the reissue rate, or $1,118.70.  (Manual, §§ 5.6, 5.50).

A borrower "shall be entitled to . . . the reissue rate" (90% of the basic rate) if:

> the property to be insured is identical to . . . the property insured 10 years immediately prior to the date the insured transaction closes *when evidence of the earlier policy is produced.* . . .

Manual, § 5.3 (emphasis added).

To obtain the refinance rate, "the Charge *shall be* 80% of the reissue rate"

> [w]hen a refinance . . . loan is made within 3 years from the date of closing of a previously insured mortgage . . . and the premises to be insured are identical to . . . the property previously insured and there has been no change in the fee simple ownership. . . .

12

Manual, § 5.6 (emphasis added). Thus, to qualify for the refinance rate, four elements must be met: (1) the refinance occurs within three years of the closing of a previous mortgage; (2) there was title insurance on the prior mortgage; (3) the insured property is identical to the property to be insured; and (4) ownership of the property has not changed.

There is no dispute that the Eschers qualified for the lower refinance rate, including that the previous mortgage was insured.[4] The dispute is whether they were entitled to it. The conflict centers around whether the borrowers had the burden of providing evidence to the lender, at or prior to closing, that they had title insurance in connection with the previous mortgage, or whether it is the lender's obligation to ascertain at closing that the borrowers had preexisting title insurance.

The defendants place the evidentiary burden on the borrowers, arguing that the lender must charge the refinance rate only if the borrowers provide evidence of preexisting title insurance at or prior to closing.

The Eschers counter that they were not required to furnish proof of a prior policy because it is the lender's burden to ascertain whether the borrower is eligible for the lower insurance rate. Comparing the language in the reissue rate provision (§ 5.3), which requires that "evidence of the earlier policy [be] produced," to the language in the refinance rate provision (§ 5.6), which does not have this requirement, they argue that a borrower has the burden of producing evidence of a preexisting policy at closing only with respect to eligibility for the *reissue* rate, and not the *refinance* rate. The Eschers contend that to

---

[4] As the HUD-1 Settlement Statement from the Eschers' earlier loan with BNC shows, the Eschers met the four requirements to qualify for the lower rate: (1) the BNC loan closed on Sept. 19, 2001, which is less than three years prior to the closing of the Decision One loan; (2) the Eschers paid more than $1,600 for title insurance; (3) the property is the same; and (4) the owners are identical.

be charged the refinance rate, all they had to prove, *at trial,* was that they previously had title insurance and otherwise qualified for the lower rate. In the alternative, they argue that the lender knew or should have known of the existence of title insurance on the property because it knew there was a prior loan.

The Bankruptcy Court held that the proper evidentiary standard is whether there is evidence in the record showing that, at the time of the loan closing, the lender knew or should have known that the borrower qualified for the lower insurance rate. *Escher I,* 369 B.R. at 877. Specifically, it stated that "if a borrower contends that a lender failed to obtain the lowest title insurance rate permitted by law, she has an affirmative burden to demonstrate that the lender knew or should have known of the facts justifying that lower rate." *Id.* (citations omitted). Following the reasoning of several bankruptcy courts, the Bankruptcy Court explained that in determining the reasonableness of loan charges, the burden of proof should be on the party with the greater access to the information to demonstrate the reasonableness of the fee. For example, the lender has greater access to information about the reasonableness of courier and broker fees. With respect to the existence of prior title insurance, it determined that the borrower has better access to that information. *Id.* (citing *In re Fields,* Adv. No. 05-005, slip. op. at 27-29, 31-32 (Bankr. E.D. Pa. Mar. 24, 2006) (Fox, B.J.) (*"Fields I"*)) (other citations omitted). In addition, the Bankruptcy Court reasoned that the plaintiff typically bears the burden of proving her claims. *Id.* On these grounds, the Bankruptcy Court held that the lender was required to charge the Eschers the lower refinance rate only if it knew, or should have known, at or before closing, that there was title insurance on the prior mortgage. *Id.*

At the time and since the Bankruptcy Court issued its opinion in this case (*Escher*

14

*l*), numerous district and bankruptcy court decisions in this district, as well as one unpublished Third Circuit opinion, have held that the lender was required to charge the lower refinance rate only when the borrower had provided proof at closing that there was preexisting title insurance.  *See, e.g., Ricciardi v. Ameriquest Mortgage Co.*, 164 Fed. Appx. 221, 226 (3d Cir. 2006) (borrower not entitled to refinance rate because he provided no evidence of prior title policy to lender prior to or at closing); *In re Fields*, Civ. Action No. 06-1753, 2006 WL 2191342, at *3-*4 (E.D. Pa. July 31, 2006) (Bartle, C.J.) (*"Fields II"*) (even though parties agreed that the property had been previously insured, because the borrower had not provided proof at closing that there was preexisting title insurance, lender not required to charge reissue or refinance rate); *Jones v. Aames Funding Corp.*, Civ. Action No. 04-CV-4799, 2006 WL 2845689, at *6-*7 (E.D. Pa.  Mar. 7, 2006) (Davis, J.) (borrowers not entitled to reissue or refinance rate because they did not provide at closing proof of prior insurance or proof that there was no change in fee simple ownership); *Stump*, 2005 WL 645238, at *5 (borrowers not entitled to refinance rate because they never produced evidence of prior insurance, even in summary judgment papers); *Davis*, 2007 WL 3342398, at *5 (same); *In re Glauser*, 365 B.R. 531, 536-539 (Bankr. E.D. Pa. 2007) (Sigmund, B.J.) (borrowers not entitled to refinance rate because they never produced evidence of prior insurance, even at trial, and failed to prove that the identical premises was insured in both transactions); *Chiles v. Ameriquest Mortgage Co.*, 551 F. Supp. 2d 393, 397 (E.D. Pa. 2008) (Tucker, J.) (borrower not entitled to refinance rate because he did not provide "evidence of an earlier policy" at the time of closing as required by the Manual) (citing *Fields II*); *In re Madera*, 388 B.R. 586, 599-600 (E.D. Pa. 2008) (Gardner, J.) (noting that although § 5.6 has no explicit requirement that the borrower provide

evidence of the terms of the prior title insurance for the refinance rate, courts within the Third Circuit generally require the borrower to offer evidence that the lender knew or should have known of the existence of the prior title insurance, and consequently, lender could charge the borrowers the basic rate in light of the borrowers' failure to provide lender with evidence of a prior insurance policy).

Applying this evidentiary standard, the Bankruptcy Court found that the Eschers offered no proof that the lender was aware of the existence of prior insurance at the time of the closing. This finding was based on the fact that the only "proof" of preexisting insurance was the HUD-1 statement from the Eschers' previous loan closing, which was produced by the Eschers *during discovery* of the adversary proceeding, and the Eschers' unsupported statements in their summary judgment briefs that it is "very likely that Decision One and the insurer did in fact know" that the Eschers had prior insurance.

The Bankruptcy Court's finding that the Eschers offered no proof that the lender was aware of the existence of prior insurance at the time of the closing was not clearly erroneous. However, the question on appeal is whether the evidentiary standard applied by the Bankruptcy Court - that to be entitled to the refinance rate, the borrower must offer evidence that *at closing* the lender knew or should have known of the existence of the prior title insurance - is legally correct.

After the Bankruptcy Court issued its opinion, the Third Circuit issued an unpublished opinion in which it signaled its disapproval of importing § 5.3's evidentiary burden into § 5.6. *See In re Fields*, 283 Fed. Appx. 897, 899 (3d Cir. 2008) ("*Fields III*"). In that case, as here, the borrower alleged that she should have been charged the refinance rate for title insurance. After a trial, the bankruptcy court found that she had not

16

provided sufficient evidence that the lender knew or should have known at the time of

closing that she qualified for the refinance rate.   Although she did not challenge the

bankruptcy court's finding that she failed to provide the lender with evidence of previous

title insurance at closing, the borrower argued on appeal that the bankruptcy court erred

in imposing the § 5.3 burden to produce evidence of prior insurance on her because § 5.6

did not contain the "evidence of the earlier policy [be] produced" language found in § 5.3.

Because the parties in *Fields* had stipulated that the borrower had previous title insurance,

the borrower argued that she met § 5.6's requirement that the premises were previously

insured. *Id.* at 899.

After framing the borrower's contention on appeal, the *Fields III* court cautioned:

> We have not decided this issue in a precedential opinion, and
> we note that *Ricciardi v. Ameriquest Mortgage Co.*, 164 Fed.
> Appx. 221 (3d Cir. 2006), cited by the Bankruptcy Court and
> District Court and relied upon by [the lender], is a
> not-precedential opinion in which the section 5.3 evidentiary
> requirement was imposed to establish entitlement to a
> refinance rate under section 5.6, which is silent on that score.

*Id.*[5]

The court then stated that it "need not reach the issue here," and affirmed the

bankruptcy court on other grounds.   Specifically, because the borrower never furnished

proof that the insured premises were "identical to or part of the real property previously

insured" or that there had been "no change in the fee simple ownership" of the property,

the court held that the borrower failed to prove that she qualified for the refinance rate in

§ 5.6.  *Id.*  Thus, the holding was premised on a lack of evidentiary proof at trial and not on

---

[5] The Third Circuit then "note[d]" that the Manual was revised in 2005.  *Id.* at 899 n. 3. The revisions
to the Manual are discussed *infra*.

the borrower's burden at closing of the loan.

Confounding the analysis are the 2005 amendments to the Manual, which add what evidence the insurer must consider as proof of prior insurance and identify who must produce it.

Specifically, a new provision, Section 2.8, states that:

> Sections 5.3, 5.4 and 5.6 of this Manual provide that reduced rates are applicable when evidence of previous insurance is provided. . . . As evidence of previous insurance, an Insurer shall rely upon:
>
> (a) the recording (within the period of time specified within the applicable Section of the Manual) of either:
>
>> (1) a deed to a bona fide purchaser for value, or
>>
>> (2) an unsatisfied mortgage to an institutional lender; or in the alternative,
>
> (b) any of the following documents *produced by* or on behalf of *the purchaser of the title insurance* policy:
>
>> (1) a copy of the prior policy;
>>
>> (2) a copy of the marked-up commitment;
>>
>> (3) a settlement sheet showing payment of a title insurance premium; or
>>
>> (4) other written evidence acceptable to the Insurer that title insurance coverage was purchased for the property.

2005 Manual, § 2.8 (emphasis added).

Section 5.3 of the 2005 Manual has been amended to replace the language "when evidence of the earlier policy is produced" with the following:

> Evidence of previous insurance in accordance with the provisions of Section 2.8 of this Manual must be considered in

18

order to apply the reissue rate.  Insurer shall comply with the
written notice provisions of Section 2.9.[6]

2005 Manual, § 5.3.  This same language in amended § 5.3, regarding evidence of

previous insurance, has been added to amended § 5.6.

Now, the burden of production of evidence of existing title insurance is the same for

obtaining the two reduced rates.  In addition, there is a presumption that there was

previously issued insurance, within ten years for § 5.3 and three years for § 5.6, if a deed

or unsatisfied mortgage has been recorded, or if the borrower produces the prior policy,

marked-up commitment or settlement sheet showing payment of title insurance.

Comparing the plain language of § 5.3 with § 5.6 before the 2005 amendments,

there is a distinction that strongly suggests that a borrower refinancing a loan has no

burden to produce proof of prior insurance.  The reissue rate provision, § 5.3, requires that

"evidence of the earlier policy [be] produced."  The refinance rate provision, § 5.6, does not

have this explicit requirement.  Although both provisions state that the rate "shall be" a

certain amount, the trigger for entitlement to the particular rate differs.  In § 5.3, the

borrower "shall be entitled to purchase this coverage at the reissue rate" if: (1) the property

---

[6] Section 2.9 states:

A written notice must be provided to every purchaser of a title insurance
policy at or prior to closing, which shall be signed on or behalf of the
purchaser of the title insurance policy, and shall include language
substantially in the following form:

IF THIS CONVEYANCE OR REFINANCE OCCURS WITHIN TEN YEARS
OF A PREVIOUS INSURANCE OF THE SAME PROPERTY, YOU MAY BE
ENTITLED TO A REDUCED RATE.

2005 Manual, § 2.9.

to be insured is identical to property insured within the past ten years *and* (2) when

evidence of the earlier policy is produced. In contrast, in § 5.6, "the Charge shall be 80%

of the reissue rate" when the property to be insured is identical to property insured within

the past three years and there is no change in ownership. There is no language imposing

a burden of production in § 5.6. This linguistic difference compels the conclusion that the

borrower must produce evidence of a prior policy to be entitled to the § 5.3 reissue rate;

but he has no similar burden to be entitled to the § 5.6 refinance rate. Simply stated, there

is no explicit requirement as to production of evidence of prior insurance in § 5.6.

Although the Manual is neither a statute nor a regulation,[7] and the Pennsylvania

Supreme Court has not yet considered how to interpret a rate manual filed by a title

insurance rating bureau, we may look to canons of statutory construction for guidance in

discerning what was intended when the Bureau used different language in the two

sections. One such canon prescribes that where one section of a statute does not include

a specific term used elsewhere in the statute, it is presumed that the omission was

intentional and the drafters did not intend the missing language to apply. *Office of the*

*Comm'r of Baseball*, ___ F.3d ___, 2009 WL 2710153, at *7 (3d Cir. 2009) (quoting *Alaka v.*

*Attorney General*, 456 F.3d 88, 97-98 (3d Cir. 2006)). *See also Weiner v. Fisher*, 871 A.2d

1283, 1287 (Pa. Super. 2005) (citing *Fonner v. Shandon, Inc.*, 724 A.2d 903, 907 (Pa.

1999)) (when specific language is employed in one section of the statute and excluded

from another, the language should not be implied where excluded because the difference

shows a contrary legislative intent). Applying the logic of this canon of construction

---

[7] Because the Legislature has not approved the Manual, it is not a statute; and because no government entity or agency promulgated it, it is not a regulation or a body of regulations.

suggests that the Title Insurance Rating Bureau, which authored the Manual, intentionally omitted the requirement of production of evidence of prior title insurance from § 5.6.[8]

None of the cases that the Bankruptcy Court relied upon addresses the differences in the language of the two provisions. They either confuse the two provisions or conclude without any reasoning that the evidentiary burden set forth in § 5.3 applies to § 5.6. There are certified class actions in this circuit that have acknowledged the language differences between the two sections, but have yet to rule on the issue. *See Slapikas v. First Am. Title Ins. Co.*, 250 F.R.D. 232, 235, 251 (W.D. Pa. 2008) (Conti, J.); *Alberton v. Commw. Land Title Ins. Co.*, 247 F.R.D. 469, 477-79 (E.D. Pa. 2008) (Robreno, J.).[9]

The Third Circuit in *Fields III* signaled that it does not approve of the holding in *Ricciardi* that § 5.6 requires the borrower to provide evidence of prior title insurance to the lender prior to or at closing to receive the refinance rate. The *Fields III* court noted that *Ricciardi* engrafts § 5.3's evidentiary requirement onto § 5.6 even though § 5.6 is "silent on that score."[10] It then cautioned that *Ricciardi* is not precedential, and that it "need not reach the issue here," leaving it for another time. Although the court noted that the Manual has been amended, it gave no indication of how the amendments affect its view on the

---

[8] One district court has likened the Manual to a tariff or filed rate, and employed rules of interpretation applicable to a filed rate to construe the meaning of the burden of production in § 5.3. *See Slapikas v. First American Title Ins. Co.*, __ F. Supp. 2d __, 2009 WL 2869944, at *5-*6 (W.D. Pa. 2009) (Conti, J.). Because tariffs have the force of law and bind the regulated industry to its terms, *see Brockway Glass Co. v. Pa. Pub. Util. Comm'n*, 437 A.2d 1067, 1070 (Pa. Commw. Ct. 1981), rules of interpretation for a filed rate are similar to canons of statutory construction. *See PPL Elec. Utils. Corp. v. Pa. Pub. Util. Comm'n*, 912 A .2d 386, 401, 403 (Pa. Commw. Ct. 2006) (approving of an analysis of tariff language that applied fundamental canons of statutory construction).

[9] *See also Cohen v. Chicago Title Ins. Co.*, 242 F.R.D. 295, 301 (E.D. Pa. 2007) (Sanchez, J.) (acknowledging that evidentiary requirements in §§ 5.3 and 5.6 differ, but finding the differences irrelevant to the issues in that case).

[10] Indeed, *Ricciardi* contains no legal analysis or citations to support its holding.

issue.

Because it explicitly acknowledged that it was not deciding the issue of the correct standard under § 5.6, *Fields III* is not binding.  Nonetheless, it correctly noted the differences in the language of the two provisions and intimated that § 5.3's evidentiary burden should not be imported into § 5.6.

The amendments to the Manual do not support the defendants' position.  They make substantive changes to §§ 5.3 and 5.6 by adding what evidence the title insurer must consider as proof of prior insurance, and identifying who must produce this evidence.  The amendments change the evidentiary burden of § 5.3, and impose this same burden in § 5.6.

Although the evidentiary burden is now the same under both §§ 5.3 and 5.6, it is not the same burden that existed in former § 5.3.  In addition, the revised Manual splits the burden between the borrower and the insurer.  If a deed or unsatisfied mortgage was recorded within the applicable time period, the burden is on the title insurer[11] to look to those recorded documents to determine if there was prior insurance; and, if there was, it must charge the reduced rate.  If the insurance is not apparent from the documents, the borrower must produce the prior policy, prior marked-up commitment or previous HUD-1 settlement statement to get the reduced rate.

Placement of the burden of production reflects a consideration of who has superior access to the particular evidence.  The borrower has greater access to his title insurance policy, commitment or HUD-1 settlement sheet in connection with the earlier financing

---

[11] The amendments focus on the "insurer," who was not mentioned before the 2005 amendments.

transaction. However, the title agent or insurer has better access to recorded documents, which include the deed, the existing mortgage and liens. The latter documents contain information that reveals whether the ownership and the property are identical, and when the mortgage was recorded. The only remaining prerequisite for the refinancing rate – prior title insurance – may not be apparent from the recorded documents.

This case is not controlled by the amendments to the Manual that were made subsequent to the transaction at issue. Under the earlier version of § 5.6 that applies to this case, there is no reason to place the burden of proving prior title insurance on the borrower. First, the borrower would likely not know that he may be entitled to a reduced rate, a fact acknowledged by the Bureau when it imposed a notice requirement on the title insurer in the 2005 amendments.[12] Consequently, there would have been no reason for him to produce the earlier policy. Second, the realities of mortgage financing are that a lender would not extend credit secured by a mortgage without title insurance. Most lenders would not risk taking a subordinate lien priority. At the least, the insurer, in a refinancing transaction, should have known that there had been prior title insurance. Thus, it is disingenuous to contend that a lender or insurer would be ignorant of prior title insurance when the same owners of the same property are refinancing a mortgage taken less than three years previously.

The language in the Manual that covered this transaction did not require the borrower to prove the existence of prior title insurance as a prerequisite to obtaining the reduced refinancing rate. Considering the distinction between the language of the two

---

[12] *See* 2005 Manual, § 2.9.

provisions and applying common sense under the circumstances of the typical refinancing transaction, we decline to impose such a requirement in the absence of clear language to the contrary. Thus, we shall vacate the order granting summary judgment with respect to the claim of a TILA violation in connection with the title insurance fee.

### Motion for Leave to Amend

The Eschers' motion for leave to amend sought to add a defendant, add three new TILA claims, reassert TILA and UTPCPL claims that the Bankruptcy Court had dismissed on summary judgment, and reassert a RESPA claim that they had previously withdrawn. The only claims they are pressing on appeal are the denial of their request to add three new TILA violations, and to add BONY as a defendant.

In the opinion denying the Eschers' motion for leave to amend to add three new TILA claims (*Escher II*), the Bankruptcy Court cited numerous examples of the Eschers' conduct that exhibited undue delay and bad and dilatory motives. Based on the findings of the Bankruptcy Court and our review of the record, we conclude that the Bankruptcy Court did not abuse its discretion in denying the Eschers' request to add the three new TILA claims.

With respect to its denial of the Eschers' request to amend the complaint to add Bank of New York as a defendant, the Bankruptcy Court determined that amendment would have been futile because the only claims asserted against BONY, the YSP and title insurance fees, had been dismissed. Because we are remanding the case to the Bankruptcy Court to determine whether there was a TILA violation in connection with the title insurance fee, we shall vacate the order denying leave to amend to add BONY as a defendant, and the Bankruptcy Court shall reconsider the motion to amend to allow the

24

Eschers to add BONY as a defendant.

### Conclusion

The Bankruptcy Court's grant of summary judgment with respect to the reasonableness of the YSP and its denial of the Eschers' request to amend the complaint to assert three new TILA claims will be affirmed. With respect to its ruling regarding the reasonableness of the title insurance fee, the order granting summary judgment will be vacated. Therefore, the case will be remanded to the Bankruptcy Court for proceedings consistent with this Memorandum Opinion.

**ENTERED**

SEP 29 2009

**CLERK OF COURT**

25